**In re DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**CHEVRON U.S.A., INC., (formerly Gulf Oil Corporation), Plaintiff–Appellant,**

v.

**DEPARTMENT OF ENERGY, et al., Defendants–Appellees.**

Nos. 10–84, 10–86.

Temporary Emergency Court of Appeals.

Argued April 17, 1991.

Decided Sept. 19, 1991.

Judgment Entered Sept. 27, 1991.

Rehearing and Rehearing En Banc Denied Dec. 12, 1991.

Robert M. Westberg and Robert B. Gex and Craig E. Stewart, Pillsbury, Madison & Sutro, San Francisco, Cal., and Joseph W. Kennedy and Dennis M. Feeney, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., on brief for plaintiff-appellant.

Edward P. Levy and Don W. Crockett and Paul T. Michael, Judicial Litigation Div., Economic Regulatory Admin., U.S. Dept. of Energy, Washington, D.C., on brief for defendants-appellees.

Before GRANT, METZNER and PECK, JJ.

METZNER, Judge.

Chevron U.S.A., Inc. ("Chevron"),[1] the plaintiff, appeals from an order granting summary judgment to the defendant, the United States Department of Energy ("DOE"), in the sum of $162,449,034. 746 F.Supp. 1452 (D.Kan.1990).

The original dispute between the parties goes back to 1974 when DOE's predecessor, the Federal Energy Administration, issued Ruling 1974–29 clarifying its position that injection wells should not be counted in the calculation of average daily production used to determine stripper well production. Chevron contended that injection wells should be counted and continued to count them even after Ruling 1974–29 was issued.

In 1978 the District Court of Kansas held that Ruling 1974–29 was invalid because it was not promulgated in compliance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 553. *Energy Reserves Group, Inc., v. Federal Energy Admin.*, 447 F.Supp. 1135 (D.Kan.1978). Subsequently, on June 25, 1979, Chevron obtained a preliminary injunction restraining the DOE from enforcing Ruling 1974–29. As a condition for the issuance of that order, the district court directed that Chevron deposit with the clerk of court:

> [t]he difference between the price received by them for crude oil sold pursuant to any such certification of a property as a stripper well property and the price for which such crude oil would have been sold had the same been sold pursuant to a certification of the property as a non-stripper property. (Stipulated Record ("S.R.") 151)

The original order invalidating Ruling 1974–29 was reversed by this court on October 31, 1978, and the matter remanded to the district court for further proceedings. 589 F.2d 1082 (TECA 1978). On remand, the district court again invalidated the Ruling (520 F.Supp. 1232 (D.Kan.1981)), but this court reversed the district court in July 1981 and sustained the Ruling. 690 F.2d 1375 (1982). The Supreme Court denied certiorari on January 10, 1983.

There is no dispute that Chevron is liable to DOE for improperly counting injection

---

1. Chevron is the successor to Gulf Oil Corporation which was the original plaintiff in this case. For simplicity, all of Gulf's actions are attributed to Chevron.

wells to determine stripper well production and that the amount to be paid consists of principal and prejudgment interest. There are, however, three areas of disagreement on appeal:

1. Whether the district court correctly applied the DOE "policy rates" to calculate Chevron's prejudgment interest.

2. Whether the district court correctly applied the "United States Rule" to determine how Chevron's payments into court pursuant to the preliminary injunction order were to be allocated between interest and principal.

3. Whether the district court correctly refused to allow Chevron to have its overcharge liability calculated on the basis of the lawful alternative property configurations that would result in the least liability to Chevron.

### Policy Rates

DOE seeks to apply its "policy rates" to calculate Chevron's prejudgment interest. These rates are based on an average of prime rate values as determined by the Federal Reserve Board. Chevron argues that the application of these rates will cause it to pay over $34 million in excess of what its costs would have been if it had borrowed the money to pay the amounts due on time. Chevron urges that prejudgment interest is granted to award the injured party whatever unjust enrichment the wrongdoer received as the result of having the use of the money and that Chevron's borrowing costs properly reflect unjust enrichment more accurately than application of DOE's policy rates.

 The weakness in Chevron's argument is that restitution serves not only to disgorge ill-gotten gains, but to restore the status quo as well. See 5 Moore's *Federal Practice* ¶ 38.24[2], quoted with approval by this court in *Sauder v. Department of Energy*, 648 F.2d 1341, 1348 (1981). Thus, the injury here is properly measured by what the injured party lost by not having the money available for its use. The only question is whether there is a reasonable basis for applying the DOE policy rates. This court has consistently held that the

DOE policy rates reasonably reflect the cost of money. See, e.g., *Lea Exploration, Inc. v. Department of Energy*, 843 F.2d 510, 514 (TECA 1988); *Citronelle–Mobile Gathering, Inc. v. Herrington*, 826 F.2d 16, 30 (TECA), *cert. denied*, 484 U.S. 943, 108 S.Ct. 327, 98 L.Ed.2d 355 (1987); *United States v. Exxon Corp.*, 773 F.2d 1240, 1273 (TECA 1985).

Furthermore, as the above-cited cases indicate, uniformity is a goal in deciding cases under the price control statutes. Thus, as long as the DOE rate is reasonable, it should be applied uniformly. There is no reason to burden the courts in these cases with trials to determine individual oil producers' cost of money.

### United States Rule

 According to the United States Rule, a creditor may allocate partial payments on an interest-bearing debt first to accrued interest that is due, and then to principal. See *Story v. Livingston*, 38 U.S. (13 Pet.) 359, 370, 10 L.Ed. 200 (1839); *Shutts v. Phillips Petroleum Co.*, 567 P.2d 1292, 1321 (D.Kan.1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). "But it is a rule to apply in the absence of a clearly expressed intention to handle allocation in some other way." *Nat G. Harrison Overseas Corp. v. American Barge Sun Coaster*, 475 F.2d 504, 507 (5th Cir. 1973). See also *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 865 F.2d 566, 576 (3d Cir. 1989); *Devex Corp. v. General Motors Corp.*, 749 F.2d 1020, 1025 (3d Cir. 1984).

The June 25, 1979 order granting the preliminary injunction provided that Chevron was to pay into the escrow account the amounts of the actual overcharges (the principal in this case), and that:

IT IS FURTHER ORDERED that the Clerk of the Court invest any and *all funds so received* in interest bearing short term obligations of the United States Government until the further order of this court. (Emphasis supplied.)

More significantly, it provided that:

[I]n the event funds so paid to the Clerk of this Court are later determined to be subject to refund to the purchaser

of the crude oil, then at that time *said funds shall be paid directly to the purchaser* of the crude oil together with all accrued interest thereon, *in full satisfaction and discharge of the plaintiffs' refund obligations* pursuant to appropriate regulations of the Department of Energy. (Emphasis supplied.)

■ We are not concerned here with whether the allowance of prejudgment interest is proper (*see, Lea Exploration, Inc., supra*), but rather, how Chevron's deposits pursuant to the preliminary injunction should be allocated between principal and interest.[2] The language of the order granting the injunction is concise and unambiguous with respect to how funds deposited into the escrow account were to be allocated in the event DOE Ruling 1974–29 was upheld and a refund was ordered. What went into the account as principal was to come out of the account as principal "in full satisfaction and discharge of [Chevron's] refund obligations." The government made no attempt to modify that order, and cannot now argue that allocation must be handled in some other way.

The United States Rule is inapplicable where, as here, there was an express understanding in the district court's order as to how the deposits in the escrow account were to be allocated if the DOE Ruling 1974–29 was found valid and enforceable. That event occurred when the Supreme Court denied certiorari in *Energy Reserves Group, Inc., v. Hodel, Sec. of Energy,* 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). The provisions of the preliminary injunction order are controlling until that date. However, the United States Rule applies to any payments required after January, 1983.

*Lawful Alternative Property Designations*

Chevron argues that it should be permitted to change its previously designated property configurations so as to minimize its liability in this case. The alternative

designations would have been legal at the time that the original designations were made. However, had they been used initially, they probably would not have been as profitable to Chevron.

Chevron's originally designated property configurations were legal when made. We can assume that the designations chosen were based on obtaining maximum usage of injection wells in defining stripper well oil which was exempt from price control. Chevron knew at the time that the inclusion of injection wells was contrary to DOE's ruling, but it hoped that this ruling would be nullified by the courts. When the validity of Ruling 1974–29 was upheld by this court, Chevron became liable for overcharges for oil sold from these properties due to its illegal inclusion of injection wells. All it is being asked to do now is to return the overcharges on that oil.

■ While the counting of injection wells on each property was held to be unlawful, the property configurations in themselves were not unlawful. Under these circumstances, Chevron may not use alternative property designations to reduce the amount of its liability. Though there is no case directly on point, the court finds persuasive the reasoning in those cases cited by DOE involving private actions under the price regulations. Those cases uniformly hold that where the original cost allocation was permissible but not required, retroactive recalculation should not be allowed to offset overcharges which had arisen as a result of unrelated regulatory violations. *See, e.g., Naph–Sol Refining Co. v. Murphy Oil Corp.,* 550 F.Supp. 297, 313 (W.D.Mich.1982), *aff'd in part, rev'd in part, on other grounds, sub nom. Mobil Oil Corp. v. Department of Energy,* 728 F.2d 1477 (TECA), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984); *Martin Oil Service, Inc. v. Koch Refining Co.,* 718 F.Supp. 1334, 1352 (N.D.Ill.1989); *Don Van Vranken v. Atlantic Richfield Company,* 699 F.Supp. 1420, 1425 (N.D.Cal.1988).

---

2. When establishing an escrow account, a district court is of course not required to provide for the payment of all possible judgment costs, such as prejudgment and postjudgment interest, that may arise after final determination.

The court below found that a stipulation entered into between the parties on October 25, 1983, bars Chevron "from contesting the property designations in this case." This stipulation concerned administrative proceedings before the Office of Hearings and Appeals ("OHA"). The portion of the stipulation referred to by the court below provided that the OHA was not stayed from deciding the appropriateness of certain of Chevron's property configurations. However, the lower court's reliance on this section of the stipulation is misplaced because Chevron is not contesting the propriety of the original designations in this proceeding. Rather, it wishes to use other lawful designations for the purpose of reducing its liability on the injection well issue.

The stipulation expressly provides that all issues should proceed before the OHA *"other than the injection well issue and Gulf's liability thereunder ...."* [Emphasis added.] The stipulation further provides that it is not intended to bar or waive "any objection which either party may interpose, or any argument that either party may raise in the multidistrict litigation [the injection well issue]."

On March 8, 1985, the parties entered into a consent order which settled all issues between them, except "the issues or claims now pending and those related thereto" in the stripper well exemption litigation, and "those matters covered by" the stipulation referred to above.

It is clear that we are dealing with Chevron's liability under the injection well issue, and Chevron is not precluded from raising that issue in these proceedings.

The judgment below is affirmed in part and reversed in part and the matter remanded to the court for further proceedings consistent with this opinion.